

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
                                                          :
GERALD PHILLIPS,                                          :            10-CV-4685 (ARR)
                                                          :
                       Petitioner,                        :            NOT FOR PRINT OR
                                                          :            ELECTRONIC
        -against-                                         :            PUBLICATION
                                                          :
WILLIAM LEE, Superintendent, Green Haven                  :            OPINION & ORDER
Correctional Facility                                     :
                                                          :
                       Respondent.                        X
------------------------------------------------------------------------

ROSS, United States District Judge:

        Gerald Phillips petitions this court for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.  He challenges his 2006 conviction in Queens County for robbery in the first degree.  For

the reasons set forth below, his petition is denied.

## I. BACKGROUND

        Petitioner was tried by jury for crimes related to a botched break-in of the home located

at 164-09 107th Avenue, Queens County, New York that occurred early in the morning of April

16, 2006.  According to the prosecution's theory of the case, petitioner was part of a four-person

venture to unlawfully enter the premises and steal property from the inhabitants.  Petitioner, his

codefendants, Shawn Hill and Rodney Flora, and decedent Shamari Hill, armed with firearms,

forced inhabitant Anthony Peterson to open the house to them.  Once inside, petitioner and the

codefendants struck inhabitant Clarence Washington on the nose, and tied him and his girlfriend,

Michelle Bottoms, on the kitchen floor with telephone cord.  Petitioner and his accomplices took

money, credit cards, wallets, keys and jewelry from Michelle, Anthony and Anthony's girlfriend,

Nicole Glenn.  Meanwhile, Deon Jones, hiding upstairs with his girlfriend, Alicia Edwards,

1

placed several 9-1-1 calls to the police unbeknownst to the intruders. When the police arrived at

the scene, petitioner and his accomplices ran upstairs and attempted to exit through a window.

Upon realizing that the house was surrounded, each of the accomplices elected a different option.

Co-defendant Shawn Hill ran downstairs and attempted to escape through the front door before

being easily apprehended by officers at the scene. Minutes later, co-defendant Flora walked

downstairs and surrendered to police. Once police began sweeping the upper floors, petitioner

was found hiding in a closet on the second floor of the house. In his pockets he had $1,339.00, a

large amount of jewelry, and Anthony Peterson's wallet. Shamari Hill was found dead,

apparently as a result of suicide, on the third floor of the house with a single bullet shot through

his head and two pieces of jewelry in his throat.

Petitioner was tried by jury, along with co-defendants Hill and Flora, for first degree

burglary, first degree robbery, kidnapping in the second degree, criminal possession of a weapon

in the second degree, criminal possession of a weapon in the third degree, two counts of robbery

in the second degree, one count of assault in the second degree, and one count of criminal

possession of stolen property in the fifth degree.

At trial, the principal witnesses called by the prosecution were the police officers who

investigated the scene and arrested petitioner and his co-defendants, and two of the alleged

victims: Michelle Bottoms and Alicia Edwards. According to Michelle's testimony, in the early

morning of the 16th, she was in the first floor bedroom of the home watching television with her

boyfriend, Clarence Washington, when Anthony Peterson knocked on one of the bedroom doors

and asked Clarence to come outside to speak with him. (Trial Tr. at 161-64). Clarence opened a

different bedroom door to investigate, after which Michelle heard someone fall to the floor

outside the room. (Trial Tr. at 164). A man Michelle did not recognize entered the room and,

2

presumably after bringing her to the kitchen, told her to lie on the floor keep her head down. Id. Another man then tied her and Clarence's arms and legs with telephone cord, and asked her if there was any money in the house. (Trial Tr. at 165-66). From her position on the floor, Michelle heard the men rummaging through her purse and taking her jewelry, credit cards, and car keys. (Trial Tr. at 166-68). Michelle then heard Anthony and his girlfriend, Nicole, accompanied by someone with an unfamiliar voice, descended the stairs to the kitchen. (Trial Tr. at 169). The men began threatening Nicole, asking her about money and looking through her purse. Id. The men then continued to ask Michelle, Clarence, Anthony, and Nicole where to find money. (Trial Tr. at 170-72). The men were particularly "harassing" Clarence, and when Michelle "peeked" at Clarence from beneath a coat that had been thrown over her head, she saw blood. (Trial Tr. at 171-72). It was at this point that the police arrived, prompting the perpetrators to flee upstairs from the kitchen. (Trial Tr. at 172-73). Though Michelle was unable to identify any of the defendants at trial because she was face-down on the floor during the course of the incident, she testified that Clarence Washington, Anthony Peterson, and Deon Jones were the three tenants of the home at 164-09 107th Avenue and that she, Nicole Glenn, and Alicia Edwards were visiting them that night. (Trial Tr. at 161-62).

According to the testimony of Alicia Edwards, at approximately 1:00 a.m. she had been in a third floor bedroom with her boyfriend, Deon Jones, when they heard noises that sounded like Anthony's girlfriend crying, a man telling Anthony to go "down the stairs and close your F-ing eyes," and sounds of an altercation. (Trial Tr. at 627-28). Deon Jones then made three 9-1-1 calls from Alicia's cell phone, which were introduced into evidence and played at trial. (Trial Tr. at 629-32). After the police arrived, Alicia heard "everybody running up the stairs," after which three men carrying guns "bust[ed] through the door" into the bedroom and asked who had

3

called the police. (Trial Tr. at 633, 636). At trial, Alicia identified the three intruders as

codefendants Rodney Flora and Shawn Hill, and the decedent, Shamari Hill. (Trial Tr. at 634).

The men demanded that she help them find an escape route and Alicia suggested going through

the storage doors in the attic. Id. When the intruders realized they could not escape through the

attic, they returned to the third floor bedroom. (Trial Tr. at 635). Shamari Hill, wielding a black

gun, "shook his head" and repeatedly stated to himself that he was "not going back" to prison

and would rather kill himself. (Trial Tr. at 635-37). When Alicia tried to intervene, Shamari

threatened to kill her first. (Trial Tr. at 637). At this time, defendant Rodney Flora led Alicia

out of the third floor bedroom to the second floor and assured her that she would not be harmed.

(Trial Tr. at 637-38). Alicia and Rodney reached an agreement that, in exchange for his letting

her go, she would tell the officers downstairs that he was not part of the crime, but had

accompanied her that night and was permitted to be in the home. Id. Rodney then removed a

bag of "drugs" from his sock and placed his gun and the drugs in the second floor bedroom

closet. (Trial Tr. at 638-39). At this point, Alicia heard a "loud pop" from the upstairs room

where she had last seen Shamari Hill. Id. After hearing the police call her name, Alicia walked

downstairs, with Rodney following shortly thereafter. (Trial Tr. at 639). Alicia also did not

specifically identify the petitioner as one of the burglars, but testified that, in addition to herself,

only Clarence, Deon, Anthony, Michelle, and Nicole had permission to be in the house that

night. (Trial Tr. at 641).

Police Officers Nee and Whalley both testified that upon entering the house, they found

Clarence and Michelle bound on the kitchen floor, and that Clarence appeared to be bleeding

from his head. (Trial Tr. at 29, 480, 485). After "yelling upstairs to see if anyone would answer"

and "calling for the people upstairs to come down," first Deon Jones, then Shawn Hill, then

4

Alicia Edwards, and then Rodney Flora descended the stairs and surrendered to police. (Trial Tr. at 34-36, 482-83). Detectives Werne and Papsodaro of the Emergency Service Unit ("ESU")[1] testified that upon arriving they first evacuated the first floor before systematically proceeding to clear the other floors. (Trial Tr. at 214-18, 280-83). Papasodero found petitioner hiding in a bedroom closet on the second floor. (Trial Tr. at 284-85). Von Werne and Papasodero also testified that Shamari Hill was found dead in the third floor bedroom and they observed a firearm on the floor within one foot of his right hand. (Trial Tr. at 220-21, 286). Police Officer Thomas testified that a search of petitioner at the precinct revealed a considerable amount of jewelry and $1339 in cash in his pockets. The jewelry in petitioner's pockets included eight gold rings, two crosses, two bracelets, one gold chain, one necklace, two engraved rings, and four earrings. Police also found in petitioner's left jacket pocket Anthony Peterson's wallet, which contained Peterson's credit card and driver's license. (Trial Tr. at 429-41). The weapons found at the scene, a 9mm pistol, a .40 caliber pistol, and a pellet gun, were all introduced into evidence. Sergeant Hawkins, an expert in firearms analysis and operability, testified that the 9mm and .40 caliber firearms recovered at the scene were operable. (Trial Tr. at 594-600).

At the conclusion of the trial, defense counsel moved for dismissal on all counts on the ground that the state had not adduced legally sufficient evidence to convict. Justice Spires denied the motion in its entirety. The jury found petitioner guilty of first degree robbery and fifth degree criminal possession of stolen property, and acquitted him of criminal possession of a weapon in the second degree, criminal possession of a weapon in the third degree, and robbery in the second degree. The jury was unable to reach a verdict as to petitioner on the other counts, and the case was adjourned for sentencing and retrial. The jury also acquitted petitioner's

---

[1] The Emergency Services Unit is a heavily-armed police unit better equipped to "clear" hostile environments than a regular responding police unit. (Trial Tr. at 31).

codefendants, Rodney Flora and Shawn Hill, of criminal possession of a weapon in the third

degree, robbery in the second degree, and criminal possession of stolen property in the fifth

degree, but failed to reach a unanimous verdict on any of the other counts.  Following the

verdict, petitioner moved to set aside the conviction for robbery in the first degree on the ground

that this verdict was "repugnant to," or inconsistent with, the jury's acquittal of all defendants,

including petitioner, of displaying a firearm.[2]  This motion was denied.

On December 20, 2006, petitioner appeared for sentencing.  In light of two prior

convictions—a 1987 attempted robbery in the first degree, and a 1992 robbery in the second

degree—the prosecution sought to have petitioner sentenced as a persistent felony offender.

(Sent'g Tr. at 10). Justice Spires found petitioner a discretionary persistent felony offender

pursuant to New York Penal Law § 70.10 and sentenced him to an indeterminate term of 20

years to life. (Sent'g Tr. at 16).

Petitioner was retried, along with his codefendants, for a separate count of robbery in the

first degree and two counts of burglary in the first degree.  Petitioner was acquitted of one of the

burglary counts and convicted of the other two counts.[3]  Petitioner appealed his convictions in

both trials to the Appellate Division, Second Department.

_____

[2] Petitioner's theory was based on the assumption that first degree robbery necessitates a finding that one of the
participants possessed firearm.  The acquittal of all defendants on the charges of displaying a firearm, petitioner
argued, was inconsistent with the jury finding this element.  The court rejected this theory on the bench presumably
because (1) the jury failed to reach a verdict as to all defendants on one of the other counts of firearm possession or
(2) the jury could have found beyond a reasonable doubt that the uncharged decedent Shamari Hill was the
participant in the first degree robbery carrying a firearm.

[3] At their second trial, Rodney Flora was convicted of one count of burglary in the first degree and one count of
robbery in the first degree, and acquitted of one count of burglary in the first degree and one count of robbery in the
first degree.  Shawn Hill, charged with the same counts, was convicted only on one count of burglary in the first
degree.  Flora's and Hill's convictions at the second trial were reversed by the Appellate Division on the ground that
the evidence presented at trial failed to establish that Clarence sustained a "physical injury," which, as charged, was
required to convict the defendants of first degree robbery and burglary.  See People v. Phillips, 68 A.D.3d 1137 (2d
Dep't 2009); People v. Hill, 83 A.D.3d 865 (2d Dep't 2009); People v. Flora, 83 A.D.3d 861 (2d Dep't 2009).

Because the Appellate Division reversed both of petitioner's convictions from his second

trial, and petitioner thus does not challenge them here, the court focuses only on the record

relating to his convictions after the first trial. Petitioner raised five principal arguments on

appeal: (1) that the evidence adduced at trial was legally insufficient to convict petitioner; (2)

that his first degree robbery conviction was repugnant to, or inconsistent with, his, and his

codefendants' acquittal of all weapons charges and charges of second degree robbery; (3) that the

trial court's admission of the recordings of complainant Deon Jones' contemporaneous 9-1-1

calls violated his Sixth Amendment right to confront witnesses; (4) that N.Y. Penal Law § 70.10,

the New York discretionary persistent felony offender statute pursuant to which he was

sentenced, violated his Sixth Amendment right to a jury trial; and (5) that the sentencing court

failed to follow the appropriate state sentencing procedure under N.Y.C.P.L. § 400.20. In a

decision dated December 22, 2009, the Appellate Division reversed petitioner's conviction for

criminal possession of stolen property in the fifth degree but affirmed the judgment of conviction

of first degree robbery.[4] People v. Phillips, 68 A.D.3d 1137 (2d Dep't 2009). It rejected on the

merits petitioner's contentions that the evidence was legally insufficient to support his first

degree robbery conviction and that the verdict convicting him of robbery in the first degree but

acquitting on the weapons charges was repugnant. It found unpreserved for appellate review

petitioner's contentions that the sentencing court failed to follow the appropriate procedural

mandates of N.Y. C.P.L. § 400.20, that petitioner's sentence pursuant to N.Y. Penal Law §

70.10, the persistent felony offender statute, was unconstitutional, and that petitioner's

conviction of first degree robbery but not second degree robbery was repugnant. On May 19,

---

[4] As noted above, petitioner's first degree burglary and first degree robbery convictions (as to Clarence Washington) were also reversed by the Appellate Division.

2010, the New York Court of Appeals denied petitioner leave to appeal. People v. Phillips, 14 N.Y.3d 891 (2010).

Petitioner timely filed the instant petition for a writ of habeas corpus on October 13, 2010, raising three grounds for relief: (1) that the evidence adduced at trial was insufficient to sustain a conviction for first degree robbery under Jackson v. Virginia, 443 U.S. 309 (1979); (2) that the recordings of complainant's contemporaneous 9-1-1 calls were admitted into evidence in violation of petitioner's confrontation rights as set forth in Crawford v. Washington, 541 U.S. 36 (2004); and (3) that petitioner's sentence pursuant to N.Y. Penal Law § 70.10 violated his Sixth Amendment right to a trial by jury under the principles outlined in Apprendi v. New Jersey, 530 U.S. 446 (2000), or alternatively, that petitioner's due process rights were violated by the trial court's failure to abide by the procedural requirements of N.Y. C.P.L. § 400.20 before imposing the discretionary sentence.

## II. DISCUSSION

### A. Standard of Review under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a deferential standard of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. See 28 U.S.C. § 2254(d). Under the AEDPA standard, the reviewing court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. The statutory language "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's

decisions as of the time of the relevant state-court decision." <u>Williams v. Taylor</u>, 529 U.S. 362,

412 (2000); <u>see also</u> <u>Gilchrist v. O'Keefe</u>, 260 F.3d 87, 93 (2d Cir. 2001).

 A state court decision is "contrary to" clearly established Supreme Court precedent if

"the state court applies a rule that contradicts" Supreme Court precedent or if "the state court

confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

Court and nevertheless arrives at a result different from that precedent." <u>Williams</u>, 529 U.S. at

405-06. A decision is an "unreasonable application" of clearly established federal law if a state

court "identifies the correct governing legal principle from [the Supreme Court's] decisions but

unreasonably applies that principle to the facts of [a] prisoner's case." <u>Id.</u> at 413. In determining

whether an application was objectively unreasonable, "the most important point is that an

unreasonable application of federal law is different from an incorrect application of federal law."

<u>Id.</u> at 410. A federal habeas court may only "issue the writ in cases where there is no possibility

fairminded jurists could disagree that the state court's decision conflicts with [the Supreme]

Court's precedents." <u>Harrington v. Richter</u>, 131 S. Ct. 770, 786 (2011).

**B. Procedural Default**

 A federal court may not review state court decisions that rest on an "adequate and

independent state ground" for the judgment, such as a state procedural default. <u>See</u> <u>Harris v.</u>

<u>Reed</u>, 489 U.S. 255, 261 (1989); <u>Galarza v. Keane</u>, 252 F.3d 630, 637 (2d Cir. 2001) (state

court's reliance must be "unambiguous and clear from the face of the opinion"). <u>But see</u> <u>Lee v.</u>

<u>Kemna</u>, 534 U.S. 362, 376, 381 (2002) (noting the existence of a "small category" of

"exceptional cases in which exorbitant application of a generally sound rule renders the state

ground inadequate to stop consideration of a federal question"). This is so even where the state

court reaches the merits in an alternative holding. <u>Harris</u>, 489 U.S. at 264 n.10; <u>Velasquez v.</u>

9

Leonardo, 898 F.2d 7, 9 (2d Cir.1990).  Where a state court rules against a petitioner on procedural grounds, the petitioner faces a "procedural default" precluding federal habeas review.

This court cannot consider petitioner's procedurally defaulted claims unless he can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).  To show cause, a petitioner must show that "'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." McCleskey v. Zant, 499 U.S. 467, 493 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).  To show prejudice, a petitioner must demonstrate that the alleged error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Torres v. Senkowski, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks and citation omitted).  If a petitioner is unable to show cause and prejudice, his procedural default may nonetheless be excused if he can show that a "fundamental miscarriage of justice" would result from a failure to hear the claim on the merits, in other words, "that he is actually innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (citing Schlup v. Delo, 513 U.S. 298, 321 (1995)); but cf. Doe v. Menefee, 391 F.3d 147, 161 (2d Cir. 2004) (noting that "credible claims of actual innocence are 'extremely rare'") (citing Schlup, 513 U.S. at 321-22)).  In order to overcome a procedural default on this ground, a petitioner "must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." House v. Bell, 547 U.S. 518, 536-37 (2006) (citation omitted).  Such a claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness

10

accounts, or critical physical evidence—that was not presented at trial." Id. at 537 (citation omitted).

### C. Sufficiency of the Evidence (Jackson)

Petitioners challenging the sufficiency of the evidence face a "very heavy burden." Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir. 1995). On federal habeas review, courts must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original). The court must defer to the jury's "assessments of the weight of the evidence and the credibility of witnesses." Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996). A court may only grant habeas relief if the petitioner has shown that, "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324 (emphasis added). Petitioner falls substantially short of meeting this burden.

Under New York law, a person is guilty of robbery in the first degree "when he forcibly steals property and when, in the course of the commission of the crime . . . he or another participant in the crime . . . is armed with a deadly weapon." N.Y. Penal Law § 160.15(2). Petitioner argues that the prosecutor failed to adduce legally sufficient evidence connecting any functioning firearm to petitioner, establishing that petitioner "forcibly stole" any property, or establishing that he acted as an accomplice in the commission of the robbery. Specifically, petitioner argues that the evidence established only his "mere presence" at the scene of the robbery, which is insufficient, in and of itself, to find criminal liability. See In re Tyquan N. 25 A.D.3d 502, 503 (1st Dep't 2006). Contrary to petitioner's claim, there was ample evidence in

11

the record permitting the jury to convict petitioner of robbery in the first degree on a theory of accessorial liability.

The evidence adduced established far more than petitioner's "mere presence" at the crime scene. Rather, viewed in the light most favorable to the prosecution, the evidence showed that petitioner was acting in concert with his codefendants and Shamari Hill in committing the robbery, and that if not petitioner, at least one or more of the other participants in the crime was armed with a deadly weapon. For instance, Michelle's testimony alone was sufficient basis for a rational juror to conclude that a robbery had been perpetrated by several men acting in concert the early morning of April 16, 2006. Michelle testified that several men demanded that she get down on the floor, tied her up, and took jewelry and other items out of her purse. Michelle's testimony was corroborated by the officers arriving at the scene who observed Clarence and Michelle tied up and bloodied on the kitchen floor. Though Michelle could not identify any of the assailants, her testimony, viewed in the light most favorable to the prosecution, established the "forcible stealing" element of first degree robbery.

Petitioner's identity as one of the participants in the robbery, moreover, was amply established by other evidence in the record. Specifically, Detective Papsodaro found petitioner hiding in a second floor bedroom closet during their sweep of the upper floors. Of course, petitioner's "mere presence" at the crime scene would not be sufficient to establish his guilt beyond a reasonable doubt under a theory of accessorial liability. People v. Cabey, 85 N.Y.2d 417 (1995). Officer Thomas, however, testified that when petitioner was found hiding in the closet, his jacket pockets contained $1,339, a large amount of jewelry, and Anthony Peterson's wallet. Papsodaro's and Thomas' testimony, taken together, provided a basis for several significant and plausible inferences. First, the jury could infer that petitioner either himself took,

or received from his cohorts, property belonging to the victims. That jewelry, money and, perhaps most importantly, Peterson's wallet, were all found on petitioner's person while he was hiding in the bedroom closet provides ample evidence that petitioner actively participated in the overall course of criminal conduct, which included the robbery described in Michelle's testimony. Second, the jury could infer from the repeated calls by the police to come downstairs and petitioner's hiding in the second floor bedroom closet that he was trying to evade capture. Far from proving "mere presence," this evidence was more than sufficient to permit a reasonable juror to find that petitioner participated in the forcible stealing of Michelle's property.[5] See e.g., People v. Clark, 23 A.D.3d 673 (2d Dep't 2005) (evidence sufficient to convict under a theory of accessorial liability where defendant was observed fleeing the scene of a burglary 10 minutes after the alarm sounded, driving with his headlights off while dressed in dark clothing and lacking an explanation for his presence or possession of a hat, gloves and tools within arms-reach). Finally, petitioner's identity as one of the participants of the crime was also established by the consistent testimony of Michelle and Alicia that the only people who belonged in the house that night were Clarence, Jones, Anthony and their girlfriends. Crediting their testimony, a reasonable juror could have concluded beyond a reasonable doubt that the others on the premises that night, including petitioner and the three co-conspirators identified by Alicia, acted in concert to rob the residents, including Michelle.

---

[5] That petitioner's conviction of criminal possession of stolen property in the fifth degree was reversed because the Appellate Division found "[in]sufficient proof from which the jury could have determined beyond a reasonable doubt that any of the personal property found in the defendant's possession was owned by the complainant, Michelle Bottoms," does not mandate a contrary result. People v. Phillips, 68 A.D.3d 1137,1138 (2d Dep't 2009).  To support the robbery conviction, the People had to prove that petitioner acted in concert with others in forcibly stealing Michelle's property.  Petitioner's possession of Michelle's stolen property, however, is not an element of robbery.  Although the People could not prove beyond a reasonable doubt that the jewelry found on petitioner's person belonged to Michelle, Michelle's testimony provided evidence that at least one of the co-conspirators forcibly stole her property.  In other words, possession of some of the fruits of the overall crime furnished petitioner's link to the robbery and victims, establishing that he acted in concert with the others, even if the People could not prove beyond a reasonable doubt that the fruits in petitioner's possession specifically belonged to Michelle.

Finally, the evidence adduced at trial was ample, if not overwhelming, to establish that petitioner and/or his co-participants were armed with a deadly weapon. Alicia testified that the petitioner's three co-participants were carrying guns when they entered the third floor bedroom. Alicia also testified that before Rodney Flora followed her downstairs and surrendered to the police, he placed his gun in a second floor bedroom closet. Multiple police officers testified that they found guns on the premises. Officer Nee testified that he found a 9mm on the floor in the hallway at the top of the stairs. Detectives Papsodero and Van Werne testified that they found a firearm on the floor near the right hand of Shamari Hill, indicating that his death was likely a suicide. Finally, Sergeant Hawkins testified that the firearms found at the scene were functional and operable.

Viewing the evidence in the light most favorable to the prosecution, the court finds that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. The state court's finding that there was sufficient evidence to sustain a conviction was therefore not an unreasonable application of clearly established federal law.

**D.      Confrontation Clause (Crawford)**

Petitioner argues that his right to fair trial was compromised by the admission at trial of Deon Jones' 9-1-1 calls made during the course of the incident. Petitioner maintains that these recordings were inadmissible hearsay and violated petitioner's right to confront the witnesses against him. Petitioner's argument is without merit.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. am.VI. In Crawford v. Washington, 541 U.S. 36, 53-54 (2004), the Supreme

14

Court held that the Confrontation Clause prohibits "admission of <u>testimonial</u> statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (emphasis added). The critical issue before the court is whether recordings of Jones' 9-1-1 calls were testimonial statements and therefore subject to the requirements of the Confrontation Clause. In <u>Davis v. Washington</u>, 547 U.S. 813 (2006), the Supreme Court addressed the admissibility of 9-1-1 recordings made when the alleged perpetrator was still on the premises and engaged in criminal conduct, announcing the following rule:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

<u>Id.</u> at 822. Accordingly, statements made to a 9-1-1 operator "ordinarily" are not testimonial, because the call "is ordinarily not designed primarily to establish or prove some past fact but to describe current circumstances requiring police assistance." <u>Id.</u> at 827; <u>see, e.g.</u>, <u>Whitehead v. Artus</u>, 08-CV-4064 (SJF), 2011 U.S.Dist LEXIS 101374, at *15 (E.D.N.Y. Sep. 8, 2011); <u>Gonzalez v. Lape</u>, 09-CV-4021 (RJD), 2011 U.S. Dist. LEXIS 5979, at *25-29 *25 (E.D.N.Y. Jan. 21, 2011) (finding 9-1-1 call describing shooter, including identifying information for the purpose of resolving an ongoing emergency to be non-testimonial); <u>Mitchell v. Poole</u>, 08 CV 615 (BMC)(RML), 2008 U.S. Dist. LEXIS 55028, 2008 WL 2795469, *1 (E.D.N.Y. July 18, 2006) (911 call of robbery witness "had all the earmarks of non-testimonial statements" under <u>Davis</u> where, <u>inter alia</u>, she "called 911 as [the crime] was happening or immediately thereafter, describing the particulars of the perpetrator and the location of the robbery in an agitated state"). However, "a conversation which begins as an interrogation to determine the need for emergency

assistance . . . [might] evolve into testimonial statements once that purpose has been achieved."

Davis at 828.  In this determination, the court's "analytical keynote is the emergency": 9-1-1

statements are not testimonial "when they are 'necessary to be able to resolve the present

emergency rather than simply to learn (as in Crawford) what had happened in the past.'"

Gonzalez, 2011 U.S. Dist. LEXIS 5979, at *25 (quoting Davis, 547 U.S. at 828)) (emphasis in

original).

        The court finds that the substance of the 9-1-1 calls admitted into evidence were not

testimonial.  Alicia testified that Deon placed these calls while they were hiding in the third-floor

bedroom of the premises, during the course of the ongoing robbery, a fact corroborated by Deon

in his statements to the 9-1-1 operator.  Deon's own statements and demeanor during the calls

make clear that he was "describ[ing] current circumstances requiring police assistance" in an

emergency. Davis, 546 U.S. at 827.  For instance, he spoke in a low voice or whisper during the

entirety of the calls, stating that three or more men had broken into his home.  When asked to

speak up by the 9-1-1 operator, he replied that he could not because he was hiding, indicating an

fear of detection.  Furthermore, the questions posed by the operator—such as whether the

intruders were armed and where they were in the house—were aimed at assessing the nature of

the emergency and the dangerousness of the situation.  Nor did the testimony introduced during

the 9-1-1 calls ever "evolve into testimonial statements." Id. at 828.  Though Deon Jones was

asked to identify the intruders, he stated that he could not because he was hiding upstairs.

Finally, at no point during the phone calls did the emergency dissipate.  Undoubtedly, the

"primary purpose of the [9-1-1 dialogue] [was] to enable police assistance to meet an ongoing

emergency." Id. at 822.  Indeed, it is hard to imagine a situation that more precisely characterizes

an ongoing emergency: the declarant was hiding from intruders whom he believed to be armed,

while his co-inhabitants were restrained below, and was seeking assistance from the police who had not yet arrived, or were just arriving at the scene. The statements made in Deon's 9-1-1 calls were therefore not testimonial, and their admission did not violate petitioner's Confrontation Clause rights.

Citing Brown v. Keane, 355 F.3d 82 (2d. Cir. 2004), petitioner argues that Deon's lack of personal knowledge as to whether the intruders were armed or the nature of their criminal conduct necessitates a finding that his statements failed to bear sufficient indicia of reliability, and were therefore inadmissible. Brown, however, was decided prior to the Supreme Court's decision in Crawford, at a time when the Confrontation Clause analysis turned on whether an out-of-court statement fell within a "firmly rooted hearsay exception." Brown, 355 F.3d at 88. Post-Crawford, while Brown remains pertinent to hearsay law, its analysis does not control whether the statements are nontestimonial—and therefore admissible as a matter of constitutional law under the Confrontation Clause. Rodriguez v. Lee, 10 Civ. 3451 (RMB) (JCF), 2011 U.S. Dist. LEXIS 38586, at *25 (S.D.N.Y. Feb. 22, 2011 ); cf. Brown, 355 F.3d at 89-90 (holding pre-Crawford that the "present sense impression exception applies only to reports of what the declarant has actually observed through the senses, not to what the declarant merely conjectures" and that excited utterances "must rest on personal knowledge" to be admissible).[6]

---

[6] Whether or not the admission of 9-1-1 tapes fall into the "present sense" or "excited utterance" exceptions to the hearsay rule is a New York state-court determination of New York state evidentiary law. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). For a habeas petitioner to prevail in a claim alleging evidentiary error, the petitioner must "show that the error deprived [him] of a fundamentally fair trial. Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983); see Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) ("The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'"). As set forth below, the other trial evidence was overwhelming and independently established petitioner's guilt. Precisely because Jones had not observed any of the intruders at the time, the substance of the 9-1-1 calls added little to the very strong evidence. Accordingly, any prejudice suffered by petitioner from the alleged evidentiary error was minimal.

Finally, even if the 9-1-1 conversations could be classified as "testimonial" or had at some point evolved into "testimonial" statements, any error in their admission was harmless. Confrontation Clause violations are subject to harmless error analysis. Gonzalez, 2011 U.S. Dist. LEXIS 5979, at *28-29 (citing Kotler v. Woods, 620 F. Supp. 2d 366, 394 (E.D.N.Y. 2009)). In the context of habeas review, a constitutional error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). The admitted 9-1-1 tapes had no such "substantial and injurious effect" because of the existence of substantial independent evidence of petitioner's guilt. As set forth above, petitioner's presence at the scene, his possession of jewelry, money and the wallet of one of the victims, two victims' testimony that he was invited into the house, and the officers' testimony that petitioner had attempted to evade capture by hiding in a closet independently demonstrated petitioner's guilt. The substance of the 9-1-1 calls, given Jones' limited observations from the third floor bedroom, added little, if anything, to the strong evidence of petitioner's guilt.

Accordingly, petitioner fails to establish that the court admitted Jones' 9-1-1 calls in violation of clearly established federal law.

## E.   Right to a Jury Trial (Apprendi)

Petitioner argues (1) that his sentence under New York's discretionary persistent felony offender statute, New York Penal Law § 70.10, is unconstitutional and violates clearly established federal law; and (2) that the sentencing judge, in violation of New York's procedure set forth in N.Y. C.P.L § 400.20, failed to make specific findings of fact concerning the history and character of the defendant before finding him a persistent felony offender.

Petitioner's claims are procedurally barred. Though petitioner made both arguments to the Appellate Division on appeal, the Second Department found both issues "unpreserved for appellate review" and did not address them further. People v. Phillips, 68 A.D.3d 1137, 1139 (2d Dep't 2009). A state court's finding that petitioner failed to properly preserve a claim for appellate review operates as an "adequate and independent state ground" for the court's judgment barring habeas review. See Richardson v. Green, 497 F.3d 212, 220 (2d Cir. 2007) (finding that New York's preservation rule constitutes an "independent and adequate state ground" for the purposes of habeas review). Petitioner makes no showing of any cause for this procedural default. Nor does he make any showing that "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." House v. Bell, 547 U.S. 518, 536-37 (2006) (citation omitted). Petitioner's claims regarding the legality of his sentence are thus procedurally barred.[7]

_____

[7] In any event, Second Circuit precedent interpreting the New York persistent felony offender statute requires this court to find that petitioner's sentence was not contrary to clearly established Supreme Court precedent. Petitioner cites Besser v. Walsh, 601 F.3d 163 (2d Cir. 2010) for the proposition that New York's persistent felony offender statute violates the Sixth Amendment right to a jury trial under the principles established by the Supreme Court in Apprendi, because it requires the sentencing judge, not the jury, to find facts that raise a defendant's maximum sentence exposure. Five days after the instant petition was filed, however, the Second Circuit en banc reversed the panel's holding in Besser. Portalatin v. Graham, 624 F.3d 69, 73 (2d Cir. 2010) (en banc) (holding that the New York persistent felony offender statute does not violate clearly established constitutional law). The Portalatin court determined that the persistent felony offender statute permits the judge to expand the indeterminate sentencing range only upon an antecedent showing of the defendant's predicate felonies. Id. at 93-94 ("[T]he only factual predicate necessary to impose the enhanced sentence relates to the defendant's criminal history."). Applying the "recidivism exception" of Apprendi and its progeny, which permits sentencing courts to expand the maximum sentence of a criminal defendant upon a finding by the court that the defendant had been previously convicted, the Second Circuit found that the state court did not "unreasonably apply clearly established Supreme Court precedent." Id. at 93 ("For the time being, the recidivism exception remains, and the Supreme Court has yet to [recently] assess a statute . . . that tethers the authorization for an enhanced sentence solely to findings respecting recidivism."). Petitioner's claim that his indeterminate sentence of 20 years to life pursuant to the New York persistent felony offender statute violated his right to a jury trial is thus both meritless and procedurally barred.

### III. CONCLUSION

For the reasons stated above, the application for a writ of habeas corpus is denied, and the petition is dismissed. Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. See 28 U.S.C.A. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

/s/(ARR)

_____

Allyne R. Ross
United States District Judge

Dated:          March 12, 2012
                Brooklyn, New York

20